UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

MARTHA BANKS,

                      Plaintiff,

        -against-

CAROLYN W. COLVIN,[1] Acting
Commissioner, Social Security Administration,

                      Defendant.

------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**

10 Civ. 6462 (KMK)(JCM)

To the Honorable Kenneth M. Karas, United States District Judge:

      Plaintiff Martha Banks ("Plaintiff") commenced this action pursuant to 42 U.S.C.

§ 405(g), challenging the decision of the Commissioner of Social Security ("the

Commissioner"), which denied Plaintiff's application for disability insurance benefits, finding

her not disabled.  Presently before this Court are:  (1) Plaintiff's motion to reverse the

Commissioner's decision or, in the alternative, vacate such decision and remand for further

consideration by the Commissioner, pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure ("Rule 12(c)"), (Docket Nos. 10, 24); and (2) the Commissioner's cross-motion to

remand for further administrative proceedings, (Docket No. 18).  For the reasons below, I

respectfully recommend that Plaintiff's motion should be denied in part and granted in part and

that the Commissioner's cross-motion should be granted and the case remanded for further

administrative proceedings.

---

[1] Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin, the current Commissioner
of Social Security, has been substituted as the defendant in this action.

## I. BACKGROUND

Plaintiff was born on February 26, 1959. (R.[2] 101).  From 1987 to 1994, she worked as a

caretaker on an estate, and from June to August 1994, she worked as an inspector at a laminate

company. (R. 104, 113).  On May 25, 2000, Plaintiff filed a disability insurance benefits

application, alleging that she became disabled and was unable to work as of August 24, 1999 as a

result of hyperthyroidism, mitral valve prolapse, panic attacks, Graves' Disease, and

hypertension. (R. 101, 112).  The Social Security Administration ("SSA") denied Plaintiff's

application on February 20, 2001. (R. 27).  Plaintiff appealed the denial and, on September 20,

2001, Plaintiff appeared before Administrative Law Judge ("ALJ") Neil R. Ross ("Hearing I").

(R. 523-41).  ALJ Ross affirmed the denial of benefits on September 25, 2001. (R. 54-63).  On

June 26, 2003, the Appeals Council remanded Plaintiff's case for further proceedings before the

ALJ. (R. 67-70).  ALJ Ross held a supplemental hearing ("Hearing II") on April 25, 2005, at

which Plaintiff appeared and testified. (R. 478-522).  Vocational Expert Donald Slive also

appeared and testified. (R. 505-22).  On May 20, 2005, ALJ Ross once again affirmed the denial

of benefits, concluding that Plaintiff was not disabled. (R. 12-25).  The Appeals Council denied

Plaintiff's request for review. (R. 5-7).  Plaintiff filed an action in the U.S. District Court for the

Southern District of New York. (Action I[3], Dkt. No. 1).  On May 28, 2008, the Honorable

George A. Yanthis ("Judge Yanthis") issued a report and recommendation, recommending that

the action be remanded to the Commissioner for further proceedings. (Action I, Dkt No. 21).

The Honorable Kenneth M. Karas ("Judge Karas") adopted the report and recommendation in its

---

[2] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social
security benefits, filed on the Court's Electronic Document Filing System on July 7, 2016. (Docket No. 31).

[3] Refers to action filed on February 22, 2006 with case number 7:06-cv-01428(KMK)(GAY).

entirety. *Banks v. Astrue*, No. 06-CV-1428 (KMK)(GAY), 2009 WL 2482140 (S.D.N.Y. Aug. 13, 2009).

Following the remand, on February 22, 2010, Plaintiff testified before ALJ Dennis Katz ("Hearing III"). (R. 724-68). On May 18, 2010, ALJ Katz found that Plaintiff had not been disabled from May 25, 2000, the date of her application, through the date of his decision. (R. 542-59). Plaintiff did not file objections with the Appeals Council, and as a result, ALJ Katz's decision became the final decision of the Commissioner sixty days later, on July 18, 2010. *See* 20 C.F.R. § 404.984. Thereafter, Plaintiff appealed the SSA's decision by filing the present action on August 30, 2010, (Docket No. 1), contending that ALJ Katz's decision did not comply with the Court's prior order, was based on errors of law and was not supported by substantial evidence in the record.

## A. Plaintiff's Medical Treatment History

The administrative record contains medical records from treatment that Plaintiff has received for her thyroid conditions, anxiety, cognitive and memory issues, respiratory problems, difficulties with sight and joint and back pain, dating back to the year 2000, when Plaintiff first applied for disability insurance benefits.

## 1. History of Medical Treatment Regarding Plaintiff's Thyroid Conditions

Progress notes from April, May, July, August, September, November and December 2000 show treatment for hyperthyroidism with Dr. Vladimir Andries, with the symptom of swelling in her joints. (R. 163-64, 216-223). On October 31, 2000, Dr. Andries noted that Plaintiff needed psychiatric and endocrinology evaluations because she was experiencing intense fatigue and was limited in her ability to lift because of her hyperthyroidism. (R. 172-75). He checked off on the form that Plaintiff had no limitations for standing and/or walking, sitting,

understanding, memory, and sustained concentration and persistence. (R. 178).  He noted that she was limited in her ability to push and/or pull using her upper extremities. (R. 178).  Dr. Andries concluded that he could not provide a medical opinion regarding Plaintiff's ability to do work-related activities. (R. 179).

Dr. Hesham Bazaraa of Middletown Medical performed an endocrinology evaluation of Plaintiff's hyperthyroidism on November 9, 2000. (R. 202-05).  Plaintiff reported joint pains and swelling in her elbows, arms, hands, back, feet, legs and neck, and use of a cane. (R. 202).  Regarding her anxiety disorder, she reported that she was going to a therapist, and that she felt that her symptoms were improving. (R. 202).  She reported that she was "always feeling tired" experienced chest pains, tremors and occasionally some numbness in her hands. (R. 203).  She said that she had problems with eye "irritation" and used an eye cover to keep her eyes closed at night. (R. 203).  Dr. Bazaraa's physical examination revealed a very enlarged thyroid and tremors in outstretched hands, more on the right than the left. (R. 203-04).  Dr. Bazaraa's diagnosis was hyperthyroidism, Graves' Disease as the most likely diagnosis, with a possibility of combined Graves' Disease and multinodular goiter. (R. 204).  Middletown Medical records from January 2001 to May 2001 reflect symptoms of malaise and a swollen foot. (R. 256-57).  On May 24, 2001, Dr. Bazaraa held an endocrinological follow-up with Plaintiff. (R. 257-58).  He found that her test results were consistent with moderate hyperthyroidism and normal liver functioning. (R. 257).  She complained of occasional ringing in her ears, fatigue, mild pain behind her right eye, occasional recurrent shakiness and loose stools on and off. (R. 257-58).

Plaintiff was hospitalized from December 21-28, 2001, and again from March 15-29, 2002 because of hyperthyroidism and a thyroid storm. (R. 261-63).  On April 5, 2002, she had another endocrinology follow-up with Dr. Kolo Ediale. (R. 262-68).  Dr. Ediale noted Plaintiff's

significant history of Graves' Disease, her thyroid storm in March 2002, in which she presented with altered mental status, tachycardia of heart rate greater than 150, fever, and other symptoms of hyperthyroidism, and her poor history of follow up with regards to treatment for these conditions. (R. 263). He took note of her history of exophthalmos, thyroid goiter, occasional swelling of her lower extremities, and an anxiety disorder, which could possibly be related to the hyperthyroidism. (R. 263). He indicated that she was much improved since the thyroid storm the month prior, at which time she had received radioactive iodine treatment. (R. 263). Her exam was normal, with the exception of her reporting weakness, easy fatigability, some cold intolerance, and some weight gain since receiving therapy for hyperthyroidism. (R. 265). Dr. Ediale noted that the radioactive iodine treatment could have put Plaintiff into a hypothyroid state, but that an additional thyroid function test was needed to determine her thyroid state. (R. 267). In the meantime, Plaintiff was to remain on beta-blockers and Risperdal. (R. 267).

Plaintiff had another follow-up examination with Dr. Ediale on August 19, 2002, with the same results. (R. 269). Plaintiff received another radioactive iodine treatment on April 14, 2003, in which a generous dose of Iodine was given rather than a calculated dose, because of Plaintiff's non-compliance with treatment in the past. (R. 350). She returned for a follow up on April 29, 2003. (R. 284). Dr. Ediale noted that Plaintiff had shown evidence of a reoccurrence of her hyperthyroid state since the thyroid storm in 2002, with symptoms of exophthalmos, mild proptosis, a mildly enlarged thyroid goiter, bilateral swelling of the lower extremities, and an underlying anxiety disorder. (R. 284). Plaintiff denied blurring of vision. (R. 284). Plaintiff followed up again on June 27, 2003, this time reporting fatigue and weight gain since her last appointment. (R. 289). Otherwise, Dr. Ediale's notes reflect the same findings as those from April 2003. (R. 293). Plaintiff also followed up on July 18, 2003 with Dr. Thomas Eanelli, the

doctor who performed the Iodine treatment in April 2003. (R. 352).  He reported back to Dr. Ediale that Plaintiff was iatrogenically hypothyroid and had very little risk of a recurrent thyroid storm. (R. 352).  She was taking Synthroid as a replacement therapy for the hypothyroidism. (R. 352).

Plaintiff complained of another thyroid storm on September 15, 2003. (R. 295).  At the time she was experiencing pressure in her head and dizziness. (R. 295).  She attended a follow-up appointment on that date.  Dr. Ediale's notes reflect that she was currently hypothyroid, was taking Synthroid, and had had no recurrence of her hyperthyroid state. (R. 299).  At this appointment, Plaintiff reported some memory loss and occasional headaches, which Dr. Ediale noted could be secondary to her thyroid state. (R. 300).  Lab results from September 22, 2003 showed that her thyroid panel was within normal limits. (R. 501).  She was again described as euthyroid on her replacement therapy of Synthroid at an appointment on January 30, 2004. (R. 314).  She stated that she had some visual changes, sometimes seeing double. (R. 314).  She denied shortness of breath and body aches. (R. 311).

Plaintiff had another endocrinology follow-up appointment on April 9, 2004. (R. 394).  She had gained weight since her last appointment, however, Dr. Ediale still found her to be clinically euthyroid with her replacement therapy. (R. 394).  At her appointment on July 2, 2004, Dr. Ediale diagnosed her with hypothyroidism, and continued her on the same dosage of Synthroid. (R. 399).  On September 28, 2004, Plaintiff complained of jitteriness and tremors but denied fatigue. (R. 400).  Dr. Ediale noted that she was clinically euthyroid on her replacement therapy for hypothyroidism, but that she was also presenting symptoms possibly related to hyperthyroidism. (R. 401-02).  He stopped the Synthroid, and ordered repeat thyroid function tests to evaluate her thyroid status. (R. 403).

Plaintiff saw Dr. Ediale on December 1, 2004 for a follow up on her thyroid condition. (R. 458).  Her test results had shown that she was currently hypothyroid. (R. 458).  Plaintiff denied chest pain, shortness of breath or sudden neurological deficits, but had gained weight and was experiencing some fatigue and occasional muscle and joint aches. (R. 458-59).  Dr. Ediale put Plaintiff back on the Synthroid and advised that they would do thyroid testing again in two months to assess her response to the medication. (R. 461).

Dr. Ediale completed a thyroid disorder medical assessment form on December 27, 2004. (R. 429-33).  Dr. Ediale listed Plaintiff's impairments as Graves' Disease, hypothyroidism, arthritis, asthma and gastritis. (R. 429).  Using a check-list on the form, Dr. Ediale indicated that Plaintiff would be unable to have public contact, to perform detailed or complicated tasks, to meet strict deadlines, to closely interact with coworkers or supervisors, to complete fast paced tasks, or to be exposed to work hazards such as heights or moving machinery. (R. 430).  He noted that her symptoms would frequently interfere with her attention and concentration in a work place setting. (R. 430).  He wrote that she could walk less than three city blocks without rest or severe pain, that she could continuously sit for two hours, continuously stand for thirty minutes, stand/walk for less than two hours in an eight hour work day, and sit for about two hours in an eight hour work day. (R. 431).  He noted his expectation that she would have to take eight unscheduled breaks in an average workday, and would need to rest for ten minutes at each break, because of her chronic fatigue. (R. 431-32).  He indicated that she could occasionally lift and carry less than ten pounds, rarely lift and carry ten pounds, and never lift or carry twenty pounds. (R. 432).  He noted that she had weakness in her upper extremities and, therefore, was limited in her ability to grasp, turn and twist objects (30%), her fine manipulations were limited (20%) and she was limited in her ability to reach overhead (10%). (R. 432).  He selected that she

would be absent from work more than four days out of every month. (R. 433).  He listed additional limitations of anxiety, fatigue and shortness of breath. (R. 433).

Plaintiff returned to see Dr. Carlos Lara on January 12, 2005 for symptoms of nausea, weakness, vomiting, mild headache and dizziness. (R. 462).  She said that she had not been having difficulty breathing. (R. 462).  He ordered a new thyroid panel. (R. 465).

The next notes in the record are from April 19, 2005 from Dr. Ediale. (R. 465).  He once again found her to be clinically euthyroid on her daily Synthroid medication. (R. 467).  Her weight was stable and she denied body, muscle or joint pain. (R. 465-66).  Plaintiff saw Dr. Ediale again on August 8, 2005. (R. 577).  She had gained ten pounds since the last visit, and Dr. Ediale noted that her hypothyroidism continued. (R. 579).  She reported occasional aches but no acute distress. (R. 578).  He advised her to increase her physical activity and to begin a low carbohydrate diet. (R. 580).  Plaintiff tested positive for hypothyroidism again on March 3, 2006, and had gained another twelve pounds. (R. 584).  Again she complained of occasional muscle or joint aches but no acute distress. (R. 582).

Plaintiff began seeing Dr. Kristen Hull on November 9, 2006.  She complained of hair loss in connection with her hypothyroidism, and Dr. Hull increased her dose of Synthroid. (R. 630-31).  Plaintiff saw Dr. Kristen Hull for office visits on January 11, 2007, February 11, 2008, August 14, 2008, February 26, 2009, at which her hypothyroidism symptoms were found to be stable, and she denied symptoms of fatigue, joint pain or weakness. (R. 622-25, 628-29, 678-79).

Dr. Ediale completed another Thyroid Disorder Medical Assessment Form on February 17, 2010. (R. 720-23).  He provided the same exact responses on the form as he had given in December 2005. (R. 429-33, 720-23).

**2. Records Regarding Plaintiff's Psychiatric and Cognitive Symptoms**

Plaintiff had an initial intake with Cathy Fox, Clinical Social Worker at Occupations, Inc., on July 31, 2000, and her first therapy session on November 3, 2000. (R. 181).  Ms. Fox did not conduct a psychiatric evaluation, however, the record contains her psycho-social assessment of Plaintiff. (R. 181).  Her diagnoses were panic disorder without agoraphobia, thyroid disease, mitral valve prolapse and social environment problems. (R. 185).  Ms. Fox gave Plaintiff a Global Assessment of Functioning ("GAF") score of 70. (R. 185).  During the assessment, Plaintiff reported that she had been experiencing increased anxiety and panic in the last five years, with symptoms of dizziness, racing heart, heart palpitations, sweaty palms and phobia in crowds. (R. 185).  She said that she had at least two panic attacks per month, but felt better when she remained at home. (R. 186).  She also stated that Graves' Disease made her eyes sensitive to light. (R. 185).  Ms. Fox assessed that Plaintiff had an intact memory and cognitive function, minimal impairments in judgment and insight, mild impairment as to education, marital/family, interpersonal/social aspects of her life, and no impairment in the self-maintenance category. (R. 190-91).  She further assessed Plaintiff's global central life role function impairment as mild. (R. 191).  She did note that Plaintiff had moderate impairments in her occupation functioning, but referred only to her physical health problems, not her mental status. (R. 190).

The records from Occupations, Inc. indicate that Plaintiff did not appear at her first appointment for the initial intake, and did not appear for appointments on June 21, 2000, October 31, 2000, November 17, 2000, November 21, 2000 and November 27, 2000. (R. 194, 196, 198-200).  Plaintiff gave different explanations for each failure to appear, such as her son's illness, (R. 196), Plaintiff's illness, (R. 198), lack of heat at her home, (R. 199), and conflict with other commitments, (R. 200).  The record contains notes from one session held between Plaintiff and

Ms. Fox on November 3, 2000. (R. 197).  At this session, Plaintiff reported a decrease in her anxiety and panic attacks since the intake session. (R. 197).  The notes indicate a concern that Plaintiff may have been seeking medication at her intake, and the clinician suggested cognitive behavioral techniques to address panic and anxiety without medications. (R. 197).  Plaintiff agreed to work on those techniques. (R. 197).

Plaintiff saw Dr. Laura Voss on September 16, 2003, complaining of memory loss. (R. 300).  She reported that she had had an iodine ablation to treat her Graves' Disease, and continued to take Synthroid.  (R. 300).  She stated that her memory loss had gotten worse, that she had to make lists, but she forgot what was on the lists or where the lists were located. (R. 300).  She also complained of headaches, for which she took Motrin or Tylenol for relief. (R. 300).  She indicated there were no visual changes. (R. 300).  Dr. Voss referred Plaintiff to neurologist Dr. Neustadt for an evaluation of her headache and memory loss symptoms, and recommended that she follow up with Dr. Ediale to determine if these symptoms could be related to her thyroid disease. (R. 301).  Plaintiff saw Dr. Ediale again on November 7, 2003, and his notes reflect that he was not aware of any thyroid condition that would "lead to memory loss except for significant hypothyroidism, which she is not." (R. 306).  He advised Plaintiff to follow up with Dr. Neustadt, as recommended by Dr. Voss. (R. 306).

Plaintiff had a neurological evaluation by Dr. Asadolah Baradaran on March 26, 2004. (R. 419).  Plaintiff complained of memory loss, forgetfulness, difficulty finding the right words, poor spelling and difficulty remembering names. (R. 419).  She stated that her memory of the past was normal, but she had difficulty remembering recent events. (R. 419).  A CT scan of her brain showed a mild degree of cerebral and cerebellar atrophy, greater than that which would be expected of a woman her age. (R. 419).  Dr. Baradaran concluded that Plaintiff's memory deficit

was most likely due to the mild cerebral atrophy which happened after Plaintiff's thyroid storm. (R. 419).  He prescribed Zoloft. (R. 420).

Plaintiff saw Dr. Sophia McIntyre on June 26, 2006, and complained that her memory symptoms were worsening. (R. 585-86).  She was referred for an MRI of her brain. (R. 586).

Plaintiff had a neurological consultation with Dr. Elena Kaznatcheeva on October 16, 2006, in which she described her difficulty remembering names, recent events and conversations, but denied word finding difficulty, speech problems, or any problems with her daily activities. (R. 590).  She reported that she was able to cook, go grocery shopping, and take care of her bills. (R. 590).  Dr. Kaznatcheeva ordered a CAT scan of Plaintiff's brain, but also encouraged her to be more attentive and motivated in remembering, to read, do puzzles, and crosswords. (R. 594).

### 3.  Plaintiff's Pulmonary Records

Dr. Moinuddin Ahmed provided a consultation report on December 24, 2001, following Plaintiff's hospitalization on December 21, 2001 with a complaint of chest heaviness and a cough. (R. 353-55).  Plaintiff had had shortness of breath for six days at both rest and minimum exertion. (R. 353).  She reported quitting smoking five days prior. (R. 353).  A chest x-ray revealed a left-sided pleural effusion, cardiomyopathy, and compressive atelectasis in her lower left lobe. (R. 353-54).

Plaintiff was treated for pulmonary symptoms on October 16, 2002, (R. 276-77), and April 2, 2003, (R. 280-84).  A chest x-ray on October 17, 2002 showed normal results in her lungs and pleural spaces bilaterally. (R. 360).

Plaintiff had a pulmonary consultation on October 6, 2004 with Dr. Maryann Park, and her chief complaint was difficulty breathing. (R. 404).  More specifically, Plaintiff was experiencing occasional shortness of breath with seasonal changes, mostly at nighttime when she

was lying down, and a wheezing cough. (R. 404).  She reported that she could perform most activities of daily living without any limitation, and that she smoked approximately one pack of cigarettes a day. (R. 404).  She denied fatigue. (R. 405).  Dr. Park ordered a pulmonary function test and baseline chest x-ray, and scheduled Plaintiff to return in one week for a follow up. (R. 407).  The chest x-ray from October 6, 2004 showed no acute infiltrate or effusion and was consistent with the October 2002 x-ray results. (R. 417).

Plaintiff had another chest x-ray done on January 25, 2007, which showed no acute cardiopulmonary disease. (R. 639).

### 4.  Ophthalmology Records

Plaintiff had an ophthalmology follow-up appointment on March 2, 2004, at which she showed moderate lid retraction, and visual acuity with correction of 20/25 in each eye. (R. 390).  Plaintiff was seen by Dr. Mark Tannenbaum on March 5, 2007, and reported cloudy vision and light sensitivity. (R. 697).  Dr. Tannenbaum referred Plaintiff to Dr. Leslie Green to evaluate her for cataract surgery. (R. 698).  Plaintiff had cataract surgery on her right eye on May 9, 2007. (R. 701).

On March 2, 2010, Plaintiff complained of decreased visual acuity in both eyes, but particularly her left eye at an appointment with Dr. Howard Feldman. (R. 710).  Dr. Feldman found her visual acuity in her right eye to be 20/-50, with posterior capsular opacity.  In the left eye, she had 2+ nuclear sclerosis and 3-4+ posterior polar type PSCs. (R. 711).  He found that she would benefit from TAG laser capsulotomy in her right eye, followed by cataract surgery in the left eye. (R. 711).

**5.  Orthopedic Records**

Plaintiff saw Dr. Vijayalakshmi Rampam on October 2, 2006, and he referred her to an orthopedist for her symptoms of lumbago and increased lumbar lordosis. (R. 589). Plaintiff saw Dr. Marc Appel for her low back pain on October 30, 2006. (R. 658).  An x-ray showed no abnormality. (R. 659).  She was found to have limited active range of motion with extension. (R. 659).  She was diagnosed with low back pain, sprains and strains of the sacroiliac region, and a herniated lumbar disc. (R. 659).

Plaintiff reported back pain and multiple joint pain on April 20, 2009, when she returned to Middletown Medical and saw Dr. Alexander Gapay. (R. 598).  She said that she had difficulty bending her hips, numbness in her back, and difficulty with heel to toe walking. (R. 599).  Dr. Gapay diagnosed Plaintiff with low back pain with rheumatoid arthritis and polyarthralgia and with stenosis to be ruled out. (R. 601).  Plaintiff attended physical therapy on May 1, 2009 and complained of pain in her lumbar spine, which was worsened by sitting and standing for too long, and walking distances. (R. 644-45).  Treatment notes from Dr. Ediale dated September 1, 2009 indicate that Plaintiff was prescribed Lidoderm patches and extra strength Tylenol for pain relief. (R. 692).

**B.  Consulting Physicians**

The administrative record contains evaluations by two consulting physicians.

**1.  Dr. Leslie Helprin**

Dr. Helprin conducted an intelligence evaluation of Plaintiff in August 2000. (R. 153-56). Dr. Helprin noted Plaintiff's psychiatric history, stating that she had never been hospitalized nor had she received outpatient treatment for psychiatric problems. (R. 153).  Dr. Helprin noted that she had previously been prescribed BuSpar, but that she had an allergy to the medication, and

that she was seeing a therapist at Occupations, Inc. at the time, with no diagnosis. (R. 153).

Regarding her symptoms, Plaintiff reported awakening once nightly because of pain, but had no

depression, mania, or thought disorder. (R. 153).  Regarding anxiety, Plaintiff said that she

became "jumpy" upon hearing loud noises, and had panic attacks in crowds including

palpitations and breathing difficulties. (R. 153).  She also indicated that she had short term

memory deficits. (R. 154).  Dr. Helprin noted that during the examination, Plaintiff was relaxed

and comfortable and was able to recall and understand instructions. (R. 154).  Her attention and

concentration were good, and Dr. Helprin concluded that Plaintiff was functioning cognitively in

the upper limits of the borderline to low average range. (R. 155).  She noted mild impairments in

attention and concentration and in recent and remote memory skills, with intellectual skills in the

below average range. (R. 158-59).

Regarding her daily functioning, Dr. Helprin noted that Plaintiff was able to dress, bathe

and groom herself, prepare food, manage her own money and care for her children. (R. 155).

She reported difficulty lifting and walking down stairs. She said that she socialized with friends

on the phone and when they visited. (R. 155).  Dr. Helprin diagnosed Plaintiff with a panic

disorder without agoraphobia, hypertension, asthma, Graves' Disease, and mitral valve prolapse,

with borderline intellectual functioning to be ruled out. (R. 156, 159).  She concluded that

Plaintiff was able to follow and understand simple directions and instructions, perform simple

rote tasks and complex tasks independently, maintain attention and concentration for tasks, make

appropriate decisions, relate adequately with others, and deal appropriately with stress. (R. 155).

## 2.  Dr. Cassilda James

Dr. Cassilda James provided an evaluation of Plaintiff in September 2000. (R. 169-71).

Plaintiff reported a history of Graves' Disease, hypertension, mitral valve prolapse, and anxiety.

(R. 169). She said that the anxiety bothered her "tremendously, noise and crowds seem[ed] tp

scare her, facing people seem[ed] to be a problem . . . she [could] do a one on one conversation

with mild discomfort but [had] great discomfort if she [was] in a room with several people." (R.

169). Plaintiff also complained of muscle aches, pain, dizziness, and occasional headaches. (R.

170). She reported that her medication for hyperthyroidism had not resolved her symptoms. (R.

170). She gave a history of wheezing periodically, and heart palpitations occasionally. (R. 170).

Dr. James noted that Plaintiff had generalized tremors throughout her body during the exam. (R.

171). Her diagnoses were hypothyroidism, hypertension, mitral valve prolapse, asthma versus

COPD, and she noted that Plaintiff was "not able to compete in the job market unless her anxiety

disorder [was] addressed and treated appropriately." (R. 171).

## C. Residual Functional Capacity ("RFC") Assessments

The record contains a Mental RFC Assessment dated September 13, 2000 and February

6, 2001. (R. 234-37). After reviewing the medical evidence in Plaintiff's file, the analyst

concluded that Plaintiff had mildly impaired concentration and some social withdrawal, but

despite her impairments could understand, remember, and follow directions, maintain

concentration sufficient to complete tasks, relate and respond in an appropriate manner in low

contact settings, make simple decisions and adapt to change. (R. 236-37). A physical RFC

assessment completed on February 20, 2001 based on the medical records in Plaintiff's file

found Plaintiff could occasionally lift and/or carry up to twenty pounds, frequently lift and/or

carry ten pounds, stand and/or walk for about six hours and sit about six hours. (R. 239).

## D. Testimony during April 25, 2005 Hearing before ALJ Ross (Hearing II)

Plaintiff and Vocational Expert Donald Slive testified at the April 25, 2005 hearing

before ALJ Ross, following the Appeals Council's remand. (R. 480-522). Plaintiff testified that

her current symptoms were memory loss resulting from a thyroid storm, aches and pains in her

spine, and anxiety. (R. 482-84, 486).  She testified that she had pain in her legs, arms and neck,

and that she had taken Tylenol but that she was allergic to aspirin, which prevented her from

taking arthritis medications. (R. 490).  She said that she could sit for half an hour or so, but her

back went numb and she felt pain in her joints, including in her legs, neck, shoulder, ankles and

knees from sitting. (R. 492).  She said that she could stand for 10 to 15 minutes before feeling

weak. (R. 494).  She also attested to difficulty lifting, and to pain in her finger joints that made it

difficult to use her hands. (R. 496-97, 502).  Regarding her memory difficulty, Plaintiff stated

that she had to write down everything, and could not remember things that her relatives asked

her about. (R. 503).

The Appeals Council, in remanding the case following Hearing I, had instructed the ALJ

to obtain evidence from a vocational expert regarding the effects of Plaintiff's non-exertional

limitations. (R. 69).  As a result, the vocational expert Donald Slive testified at Hearing II. (R.

505).  ALJ Ross asked Mr. Slive to consider the following hypothetical: an individual of the

same age, education and work experience as Plaintiff, with an RFC for light work with additional

mild to moderate memory deficits, while still being capable of taking care of her activities of

daily living, who suffered from mild anxiety but was not agoraphobic, and could not be exposed

to breathing irritants such as dusty environments. (R. 507-08).  With that hypothetical person in

mind, Mr. Slive testified that such a person could not perform Plaintiff's past work. (R. 508).  He

instead named three jobs in the local, regional, or national economy that such a person could

perform: assembler I, office helper, and school bus monitor. (R. 508-09).  ALJ Ross then asked

what the effect would be if the person had difficulty with the use of her hands for bimanual

dexterity, and Mr. Slive stated that this additional limitation would significantly reduce the

number of jobs available to very few if no jobs. (R. 510-11).  ALJ Ross then posed an additional

hypothetical: an individual with normal use of her hands, who could only perform work at the

sedentary level because she could only stand for two hours and sit for six hours in an eight hour

day. (R. 511-12).  Mr. Slive attested that this individual could be a surveillance systems monitor,

charge account clerk, or a document preparer. (R. 512).   Upon clarification that the person could

sit up to two hours at a time, or even up to one hour at a time with a brief stand up, move around,

and sitting back down again, Mr. Slive added other clerical jobs that would be available of

telephone quotation clerks and call-out operators. (R. 514).

 Plaintiff's representative additionally inquired as to the effect of a person being unable to

perform detailed and complicated tasks with public contact, close interaction with co-worker or

supervisor, which involved meeting a strict deadline, maintaining pace, moving machinery, or

working at heights, and Mr. Slive confirmed that this individual would not be able to work. (R.

517).  Plaintiff's counsel also asked about the effect of an individual having to stop eight times

during a workday, for approximately ten minutes, to rest, and Mr. Slive responded that being off

task for such an amount of time would preclude work. (R. 518).  Finally, Plaintiff's

representative asked about an individual who was able to perform sedentary work but had

additional bimanual dexterity limitations, and Mr. Slive confirmed that there would be limited

jobs available. (R. 519-20).

### E. ALJ Ross' May 20, 2005 Decision (ALJ Decision II)

 ALJ Ross applied the five-step approach in his May 20, 2005 decision. (R. 12-25).  At the

first step, ALJ Ross found that Plaintiff had not engaged in "substantial gainful activity since

May 25, 2000, the date she protectively filed her SSI application." (R. 24).  At the second step,

ALJ Ross determined that Plaintiff had the following severe impairments: Graves' Disease,

hyperthyroidism, anxiety disorder, history of asthma and mitral valve prolapse, and mild cerebral

and cerebellar atrophy with resultant memory deficits. (*Id.*).  At the third step, ALJ Ross held

that Plaintiff did not have a medically determinable impairment or a combination of impairments

that were listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*).

ALJ Ross then determined that Plaintiff had the RFC to perform light work as defined in

20 C.F.R. § 416.967(b), with the further limitation that she could not perform work that required

detailed or complex tasks, or work requiring exposure to pulmonary irritants such as dust,

smoke, fumes, odors, or chemicals. (*Id.*).

In determining Plaintiff's RFC, ALJ Ross held that Plaintiff's allegations as to her pain

and functional limitations were not totally credible. (*Id.*).  Based on his review of the

Middletown Medical, P.C. records through November 2004, which ALJ Ross found did not

"reflect significant physical abnormalities[,]" he found that there was "no contraindication to the

performance of light work." (R. 21).  ALJ Ross noted the Plaintiff's testimony regarding her

functional limitations and the opinion expressed by Dr. Ediale that Plaintiff could sit for only two

hours, stand/walk for less than two hours and rarely lift/carry ten pounds, were "inconsistent with

the evidence of record as a whole which instead support[ed] a greater ability to function." (R.

22).  Regarding Plaintiff's non-exertional limitations, ALJ Ross found that Plaintiff had no

limitations with regard to performing activities of daily living, no limitations with regarding to

maintaining social functioning, moderate limitations with regard to maintaining concentration,

persistence, or pace, and had never experienced any episodes of deterioration or decompensation.

(R. 22).  ALJ Ross noted that he agreed with Dr. Ediale's opinion that Plaintiff could "probably

not handle jobs that required detailed or complicated tasks . . . [but saw] no contraindication to

the performance of work requiring simple tasks." (R. 22).

At the fourth step, ALJ Ross determined that Plaintiff was not capable of performing her past relevant work. (R. 24).  ALJ Ross noted that Plaintiff was a younger individual at all pertinent times, that she had a limited education, and a history of unskilled work. (*Id.*).  At the fifth step, ALJ Ross noted that if Plaintiff were able to perform the full range of light work, considering her age, education, and past work experience, the Medical-Vocational Guidelines ("the Grid Guidelines") would direct a conclusion of "not disabled." (*Id.*).  Finding that Plaintiff's ability to perform all or substantially all of the requirements of light work was impeded by her non-exertional limitations, her mild to moderate memory deficits and inability to be exposed to bad air, ALJ Ross consulted a vocational expert to determine whether jobs existed in the national economy that Plaintiff could perform. (*Id.*).  Based on the vocational expert's testimony that an individual with Plaintiff's age, education, work experience, and RFC as stated by ALJ Ross in the hypotheticals at the hearing would be able to perform jobs such as assembler I, office helper, and school bus monitor, ALJ Ross concluded that Plaintiff was not disabled. (*Id.*).  ALJ Ross rejected the hypotheticals asked of the vocational expert by Plaintiff's representative. (R. 23).

**F.  Judge Yanthis' Report and Recommendation**

Judge Yanthis' May 28, 2008 Report and Recommendation found four errors in ALJ Ross' May 20, 2005 decision, all of which justified remand. (Action I, Docket No. 21).  First, Judge Yanthis found that ALJ Ross erred in failing to set forth his reasons for doubting plaintiff's credibility regarding her complaints of pain, making it impossible for the court to determine whether such reasons were legitimate and based on substantial evidence. (*Id.* at 7).  Next, Judge Yanthis found that ALJ Ross violated the treating physician's rule when he failed to consider more than one of the required factors, consistency with the record as a whole, in

determining that Dr. Ediale's opinion was not entitled to controlling weight. (*Id.* at 8-9).  Third, Judge Yanthis noted that ALJ Ross did not do a function-by-function analysis in determining Plaintiff's RFC and did not set forth a sufficient narrative on how the evidence supports each conclusion on Plaintiff's ability to function, thereby precluding the court from determining whether these conclusions were supported by substantial evidence. (*Id.* at 10).  Finally, Judge Yanthis determined that ALJ Ross' hypothetical questions to the vocational expert were flawed because ALJ Ross found that Plaintiff had moderate limitations with regard to maintaining concentration, persistence, or pace, and probably could not handle jobs that required detailed or complicated tasks, but did not include these limitations in the hypotheticals. (*Id.* at 11).  Judge Yanthis, therefore, recommended that the case be remanded to the Commissioner for further proceedings. (*Id.*).  Judge Karas adopted Judge Yanthis' Report and Recommendation in its entirety. *Banks v. Astrue*, 2009 WL 2482140.

## G.  Plaintiff's Testimony during February 22, 2010 Hearing before ALJ Katz (Hearing III)

Following the second remand, Plaintiff testified before ALJ Dennis Katz on February 22, 2010. (R. 724-68).  Plaintiff reported that in the five years since her last hearing before ALJ Ross, she had been experiencing symptoms of osteoporosis and rheumatoid arthritis. (R. 728-29). Plaintiff stated that she had difficulty walking, lifting, carrying, thinking and concentrating as symptoms of Graves' Disease in combination with the osteoporosis and rheumatoid arthritis. (R. 732-33).  She said that she took Tylenol, and for the last six months had been using pain patches for the pain. (R. 747).  She attested that she was not currently seeing a psychiatrist, although she had seen one four years prior, and she had stopped taking medication for her anxiety because of an allergy. (R. 733-34).  She testified that she lived with her boyfriend and her 23-year-old son. (R. 735).  She said that she did some of the cooking for the household, that she did not help with

the household shopping "as much as [she would] like to" because of the pain that she

experienced when walking. (R. 735-36).  She also said that her pain upon walking prevented her

from leaving the house to take a walk. (R. 750).  She said that she had one friend who came to

visit her at her home and that she got along with her family. (R. 736).  She also said that she had

been experiencing cataract problems for the past six years, which prevented her from reading

magazines, and she had surgery to fix the cataract in her right eye previously. (R. 743).  She

stated that she still could not see clearly, even with the assistance of glasses. (R. 744).  She also

reported that she experienced dizziness and pain in her left shoulder as a result of her mitral

valve prolapse, and that she took Tylenol and used a heating pad to deal with the symptoms. (R.

751).  She reported that she could sit for fifteen to twenty minutes before having to move

because of the pain. (R. 761).

## H.  ALJ Katz's May 18, 2010 Decision (ALJ Decision III)

ALJ Katz applied the five-step approach in his May 18, 2010 decision. (R. 542-59).

Much like ALJ Ross, ALJ Katz found that Plaintiff had not engaged in "substantial gainful

activity since May 25, 2000, the application date." (R. 547).  At the second step, ALJ Katz

determined that Plaintiff had the following severe impairments: an anxiety disorder, cognitive

deficits, cerebral atrophy, a pulmonary disorder, a thyroid disorder, obesity, and arthritis. (R.

548).  At the third step, ALJ Katz held that Plaintiff did not have a medically determinable

impairment or a combination of impairments that were listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1. (*Id.*).  In coming to this conclusion, ALJ Katz considered the "paragraph B" criteria

of listing 12.06, noting that Plaintiff reported not having treated with a psychologist or taken

psychotropic medication for many years and that her treating physicians had not reported

psychiatric symptoms during the last several years. (*Id.*).  ALJ Katz found that Plaintiff had mild

difficulty with social functioning as she testified that she got along with others, had one good friend, and a long-term boyfriend and good family relationships. (*Id.*). ALJ Katz stated that Plaintiff had only mild to moderate difficulties with concentration, persistence or pace, mostly due to her inherent cognitive deficits, and that she had exhibited some difficulty with highly complex work tasks, but that she would be fully capable of performing basic unskilled work tasks or work tasks with which she was familiar. (R. 548). He found that she had experienced one to two episodes of decompensation over the previous ten years. (R. 548). Therefore, he found that the "paragraph B" criteria were not satisfied. (*Id.*). ALJ Katz also stated that he considered the "paragraph C" criteria and found that the evidence failed to establish the presence of such criteria. (R. 549).

ALJ Katz then determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b), stating that she was capable of performing basic unskilled work tasks or work tasks with which she was familiar, with the further limitation that she could not perform work in places where she would be exposed to excessive amounts of toxic fumes. (*Id.*). In determining Plaintiff's RFC, ALJ Katz found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with his RFC assessment. (R. 556). ALJ Katz recounted the medical records from the prior ten years in detail. (R. 550-57). He noted that in 2000 Plaintiff had difficulty adjusting her thyroid levels, which led to fatigue, but that her thyroid levels had been substantially properly maintained over the last ten years, with only some intermittent reports of fatigue. (R. 557). Pulmonary problems were also rarely reported in these records. (*Id.*). ALJ Katz concluded that psychiatric issues had not been a significant factor in Plaintiff's overall health, based on the

fact that minimal counseling and psychotropic medication had been required and no significant symptoms had been reported by treating sources. (*Id.*).

Regarding opinion evidence, ALJ Katz found that Dr. Andries' 2000 evaluation that Plaintiff could not lift or carry anything was a one-time evaluation made at a time when Plaintiff was just beginning to address her thyroid condition with medication, and Dr. Andries' records showed normal findings later in the same year. (R. 552-53). He noted that Dr. Voss' recommendation of disability in February 2002 was contemporaneous with a period of exacerbation of symptoms secondary to her thyroid disorder, (R. 553), but he also said that contemporaneous treating notes mentioned no specific limitations in physical functioning, except for occasional fatigue, (R. 557). He noted that Dr. Helprin's evaluation was inconsistent with the consultative internal examination by Dr. James, which found that Plaintiff was not able to compete in the job market unless her anxiety disorder was addressed. (R. 552). ALJ Katz gave more weight to Dr. Helprin's assessment, as he found that it was consistent with the treating reports of Occupations, Inc. and Dr. Andries. (R. 552). Regarding Dr. Ediale's RFC assessment of December 2004, ALJ Katz gave it limited weight because it was given in a check off format, did not set forth a rational basis for the conclusions reached, was not consistent with contemporaneous treating information, and was not prepared for treatment but for the sole purpose of assisting the plaintiff with her disability claim. (R. 557). ALJ Katz also noted that Dr. Ediale's assessment contained his opinion on Plaintiff's difficulty with public contact, complicated tasks, strict deadlines, and close interaction with coworkers, although Dr. Ediale is not a psychiatrist. (R. 555 n.6).

ALJ Katz concluded that Plaintiff was capable of understanding, remembering and carrying out simple and routine instructions and unskilled work tasks, could make simple

decisions, and had no limitations in her ability to get along with people or co-workers. (R. 557).

He found that her short term memory was slightly impaired, so her ability to understand and

remember complex or detailed instructions was limited. (*Id.*).  He found that she could sit for up

to eight hours, stand/walk up to six hours during a work day, and had the ability to lift and carry

objects weighing up to twenty pounds. (R. 558).  Because of her cognitive impairment, he found

that she must be limited to basic unskilled work tasks. (R. 558).  Due to her pulmonary

impairment, he found that she could not be exposed to extremes of toxic fumes. (R. 558).

At the fourth step, ALJ Katz determined that Plaintiff was not capable of performing her

past relevant work. (R. 558).  ALJ Katz noted that Plaintiff was previously classified as a

younger individual, and was now a person approaching advanced age, and had a limited

education. (*Id.*).  At the fifth step, ALJ Katz noted that an RFC for the full range of light work,

considering Plaintiff's age, education, and work experience, would direct a finding of "not

disabled" by the Grid Guidelines. (R. 559).  Additionally, ALJ Katz referred to the testimony of

vocational expert Mr. Slive, from Hearing II.  He summarized Mr. Slive's testimony by stating

that Mr. Slive "considered a person who had mild to moderate memory/cognitive deficits and

could not be exposed to pulmonary irritants." (R. 559).  As Mr. Slive had opined that such an

individual could perform the jobs of assembler I, office helper, and school bus monitor, ALJ

Katz found that Plaintiff was capable of performing these jobs. (R. 559).  ALJ Katz concluded

that Plaintiff was not disabled. (*Id.*).

## II.  DISCUSSION

Plaintiff argues that ALJ Katz's decision is erroneous as a matter of law and is not

supported by substantial evidence.  Specifically, Plaintiff contends that ALJ Katz erred by: (1)

improperly relying on the Grid Guidelines and the testimony of the vocational expert from

Hearing II at step five; (2) improperly discrediting the reports of Plaintiff's treating physicians; (3) failing to perform a function-by-function analysis and to set forth sufficient analysis to allow the Court to perform a meaningful review; and (4) failing to properly evaluate Plaintiff's subjective complaints of pain. (Docket Nos. 11, 25, 26). Additionally, Plaintiff maintains that a remand solely for the calculation of benefits is appropriate. (*Id.*).

The Commissioner agrees that ALJ erred in relying on the vocational expert from Hearing II, as such "post-hearing evidence" was not made available to the plaintiff prior to Hearing III, and because the vocational expert's testimony did not comport with the directive from Judge Yanthis, adopted by Judge Karas, that the hypotheticals accurately reflect Plaintiff's impairments. (Docket No. 19). However, the Commissioner maintains that the record does not compel the conclusion that Plaintiff is disabled and, therefore, that the case should be remanded for further administrative proceedings, not solely for the calculation of benefits. (Docket No. 19).

## A. Legal Standards

A claimant is disabled and entitled to disability benefits if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)). The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117,

120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

      The claimant has the general burden of proving that he or she is statutorily disabled "'and

bears the burden of proving his or her case at steps one through four.'" *Cichocki*, 729 F.3d at 176

(quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to

show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*,

683 F.3d 443, 445 (2d Cir. 2012) (citation omitted).

## B.  Standard of Review

      When reviewing an appeal from a denial of Social Security benefits, the Court's review is

"limited to determining whether the SSA's conclusions were supported by substantial evidence

in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d

Cir. 2013) (quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g).  The Court does

not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is

disabled." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original)

(quotation marks and citations omitted).  If the findings of the Commissioner are supported by

substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46

(2d Cir. 1996).

      Substantial evidence means "more than a mere scintilla.  It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971).  The substantial evidence standard "is still a very deferential standard

of review—even more so than the 'clearly erroneous' standard.  The substantial evidence

standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder

would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (emphasis in the original) (quotation

marks and citations omitted).  "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149 (citation omitted). Even if there is evidence on the other side, the Court defers "to the Commissioner's resolution of conflicting evidence." *Cage*, 692 F.3d at 122 (citation omitted).

However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.  Failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quotation marks and citation omitted).

## C.  The ALJ's Reliance on the Vocational Expert from Hearing II

Both Plaintiff and the Commissioner agree that ALJ Katz erred in relying on the testimony of the vocational expert, Mr. Slive, from Hearing II.  Plaintiff asserts that the ALJ made three errors at the fifth step of his analysis: (1) he relied on the Grid Guidelines, which Plaintiff contends was inappropriate given Plaintiff's nonexertional impairments; (2) he relied on Mr. Slive's testimony regarding the availability of jobs, when such testimony was stale; and (3) his reliance on Mr. Slive's testimony was not in compliance with Judge Yanthis' determination, adopted in Judge Karas' order, that the hypotheticals posed to Mr. Slive were not reflective of the appropriate RFC. (Docket Nos. 11, 25).  The Commissioner in turn argues that Mr. Slive's testimony should be considered "post-hearing evidence" that Plaintiff did not have an opportunity to examine or challenge, and therefore it was improper for the ALJ to rely on it. (Docket No. 19).  Additionally, the Commissioner concurs with Plaintiff that ALJ Katz's use of Mr. Slive's testimony from Hearing II was not in compliance with the Judge Karas' directive on the last remand, that the vocational expert's testimony must reflect the RFC. (Docket No. 19).

At step five, the ALJ must determine whether a claimant's RFC allows him to perform alternative substantial gainful work in the national economy.  In making such a determination where a claimant suffers from both exertional and nonexertional limitations, the Grid Guidelines may not be controlling and instead only provide a framework for consideration of how the individual's work capability is diminished. 20 C.F.R. Pt. 404, Subpt. P, App. 2 200.00(e)(2). Within the Second Circuit, courts do not apply the Grid Guidelines where the nonexertional limitations significantly diminish the claimant's work capacity. *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

Here, ALJ Katz noted that the Grid Guidelines would direct a finding of "non-disabled" based on an RFC for the full range of light work, and considering Plaintiff's age, education and work experience. (R. 559).  However, ALJ Katz did not solely rely on the Grid Guidelines, and went on to discuss the testimony of vocational expert Mr. Slive from Hearing II.  As such, I find no reversible error based on the mere mentioning of the Grid Guidelines.  I similarly do not find that the reliance on Mr. Slive's testimony to be a due process violation, as Plaintiff had an opportunity to cross-examine Mr. Slive at the earlier hearing. *See Deno v. Colvin*, 53 F. Supp. 3d 533, 551 (N.D.N.Y. 2014) (holding that where a claimant had an opportunity to cross-examine the vocational expert at an earlier hearing, the ALJ's reliance on that testimony was not a violation of due process).  Additionally, Plaintiff's assertion that the testimony of Mr. Slive was stale, without any argument as to what conditions had changed in the labor market or the acceptable methodology, is unpersuasive.  Without more to indicate that Mr. Slive's testimony was no longer reliable, the ALJ may rely on job numbers that are "a few years old." *Rivera v. Colvin*, No. 11CIV7469-LTS-DF, 2014 WL 3732317, at *43 (S.D.N.Y. July 28, 2014); *but see*

*Townley v. Heckler*, 748 F.2d 109, 114 (2d Cir. 1984) (using outdated version of the Dictionary of Occupational Titles was reversible error).

However, ALJ Katz did commit reversible error in relying on Mr. Slive's testimony from Hearing II, because the hypotheticals posed to Mr. Slive at Hearing II were not inclusive of all of Plaintiff's impairments.  When the testimony of a vocational expert is used, the ALJ must present a hypothetical that incorporates all of Plaintiff's impairments. *Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting *Totz v. Sullivan*, 961 F.2d 727, 730 (8th Cir. 1992) for the proposition that "the hypothetical question posed to a vocational expert must fully set forth a claimant's impairments").  "If the ALJ fails to pose hypothetical questions that include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." *Brodbeck v. Astrue*, No. 5:05-CV-0257 (NAM/GHL), 2008 WL 681905, at *18 (N.D.N.Y. Mar. 7, 2008) (quotation marks and citations omitted).  As Judge Yanthis noted, ALJ Ross's hypotheticals at Hearing II "did not incorporate all of the ALJ's findings regarding plaintiff's limitations," as they omitted the ALJ's findings that Plaintiff had "moderate limitations with regard to maintaining concentration, persistence, or pace and that she could not handle jobs that require detailed or complicated tasks." (Action I, Docket No. 21 at 11).  Again, at Hearing III, ALJ Katz found that Plaintiff had "mild-to-moderate difficulties with regard to concentration, persistence or pace – most due to her inherent cognitive deficits" and "some difficulties with highly complex work tasks," (R. 548), and that Plaintiff's short term memory was slightly impaired and, therefore, "her ability to understand and remember complex or detailed instructions is limited," (R. 557), and she was limited to performing basic unskilled work tasks, (R. 558).  Nonetheless, he relied upon the testimony of Mr. Slive from Hearing II, in which these

cognitive impairments were not contemplated.  Doing so was against the directive of Judge

Karas and a legal error warranting remand.

## D.  The Treating Physician Rule

Next, Plaintiff alleges that ALJ Katz erred by failing to give controlling weight to the

assessments of Dr. Ediale, Plaintiff's treating physician.  This argument is unpersuasive.  In

determining an applicant's RFC, the ALJ must apply the treating physician rule, which requires

the ALJ to afford controlling weight to the applicant's treating physician's opinion when the

opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §

404.1527(c)(2).  Thus, "'[a] treating physician's statement that the claimant is disabled cannot

itself be determinative.'" *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting *Green–*

*Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir. 2003)).  Moreover, if there is substantial

evidence in the record that contradicts or questions the credibility of a treating physician's

assessment, the ALJ may give that treating physician's opinion less deference. *Halloran v.*

*Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (refusing to give controlling weight to treating

physicians' opinions, as they were not supported by substantial evidence in the record); *Veino v.*

*Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (same); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir.

1993) (same).

To discount the opinion of a treating physician, the ALJ must consider various factors

and provide a "good reason." 20 C.F.R. § 404.1527(c)(2)-(6).  These factors include:  (1) the

length of the treatment relationship and the frequency of examination; (2) the nature and extent

of the treatment relationship; (3) the supportability of the opinion; (4) the consistency with the

record as a whole; (5) the specialization of the treating physician; and (6) other factors that are

brought to the attention of the Court. *See Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

The Second Circuit has made clear that the ALJ need not "slavish[ly] recit[e] . . . each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see also Molina v. Colvin*, No. 13 Civ. 4701(GBD)(GWG), 2014 WL 2573638, at *11 (S.D.N.Y. May 14, 2014) (collecting cases). What is required, however, is that the ALJ provide "good reasons" when not affording controlling weight to a treating physician's opinion. *Selian*, 708 F.3d at 419 (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); 20 C.F.R. § 404.1527(c)(2)); *see also Petrie*, 412 F. App'x at 407 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)) ("[W]here 'the evidence of record permits [the Court] to glean the rationale of an ALJ's decision, [the Court] do[es] not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'").

Dr. Ediale provided two assessments of Plaintiff's impairments, in which he made identical findings.  In each, he reported that Plaintiff could sit for two hours and stand/walk for less than two hours in an eight hour work day. (R. 431).  He indicated that she could occasionally lift and carry less than ten pounds, rarely lift and carry ten pounds, and never lift or carry twenty pounds. (R. 432).  He also opined that Plaintiff would be unable to have public contact, to perform detailed or complicated tasks, to meet strict deadlines, to closely interact with coworkers or supervisors, to complete fast paced tasks, or to be exposed to work hazards such as heights or moving machinery. (R. 430).  He said that Plaintiff's limitations were the result of her conditions of Graves' Disease, chronic fatigue, heat/cold intolerance, arthralgia/myalgia (joint and muscle

aches), dry skin, goiter, weakness, depression/anxiety, weight change, muscle cramps, and ophthalmopathy. (R. 429).  He also wrote that she would be limited by her anxiety, fatigue, and shortness of breath. (R. 433).  Dr. Ediale's February 17, 2010 assessment contained the exact same conclusions as the earlier assessment. (R. 720-23).

ALJ Katz made clear that he accorded little weight to these assessments because they were given in a check-off format, did not set forth a rational basis for the conclusions reached, were not consistent with contemporaneous treating information, and were not prepared for treatment but for the sole purpose of assisting Plaintiff with her disability claim. (R. 557).  He also noted that Dr. Ediale is not a psychiatrist and nonetheless gave his opinion on Plaintiff's psychological limitations. (R. 555 n.6).

Dr. Ediale's assessments were inconsistent with the substantial evidence in the record, namely, Dr. Ediale's own treatment notes and the treatment notes from Dr. Hull.  Dr. Ediale's assessments attributed Plaintiff's limitations to symptoms of chronic fatigue, muscle and joint pain, and weakness, among other symptoms. (R. 429).  However, as ALJ Katz noted, the treatment records from this period indicate that with the exception of a short period between September and December 2004 when Plaintiff stopped taking her medication, Plaintiff's hyperthyroidism was resolved. (R. 403).  In response to the radioactive iodine treatment for her hyperthyroidism, she was hypothyroid, and clinically euthyroid on her replacement therapy. (R. 394, 399, 401-02).  She specifically denied symptoms of fatigue and joint and/or muscle aches at appointments on September 28, 2004, April 19, 2005, January 11, 2007, February 11, 2008, August 14, 2008, and February 26, 2009. (R. 400, 466, 622-25, 628-29, 678-79).  At appointments on December 1, 2004, August 8, 2005, and March 3, 2006, Plaintiff complained of occasional aches, but no acute distress. (R. 458-59, 578, 582).  These records contradicted Dr.

Ediale's assessment that Plaintiff's chronic fatigue and pain so limited her ability to perform work-related functions, and justified ALJ Katz's determination that Dr. Ediale's assessments were not entitled to controlling weight.

Additionally, I find that ALJ Katz gave adequate reasons for the limited weight that he accorded to Dr. Ediale's assessments.  First, it is not improper to credit the medical treatment records, which contained narrative assessments of Plaintiff's conditions, over a check-off form that generally lacks a narrative. *See DeFreece v. Colvin*, No. 12 Civ. 4641(JMF), 2013 WL 4028154, at *6 (S.D.N.Y. Aug. 8, 2013) (finding that the ALJ did not err in relying on "detailed, narrative reports" over a "check off" form).  Second, ALJ Katz clearly considered Dr. Ediale's rationales for his assessments and the inconsistency with the rest of the record when he discredited the assessments.  Finally, ALJ Katz also noted that Dr. Ediale's specialty as an endocrinologist did not comport with some of his assessments of Plaintiff's psychological impairments.  I do not find that ALJ Katz "traversed the substance of the treating physician rule here." *Kennedy v. Astrue*, 343 F. App'x 719, 721 (2d Cir. 2009) (quotation marks and citation omitted).  ALJ Katz had adequate reasons to discount Dr. Ediale's assessments and did not err by not giving them controlling weight.

## E.  The Sufficiency of the ALJ's Analysis

Next, Plaintiff contends that ALJ Katz erred by failing to perform a function-by-function analysis.  ALJ Katz concluded in his opinion that Plaintiff could sit for up to eight hours and stand/walk for up to six hours, and could lift/carry objects weighing up to twenty pounds. (R. 558).  He based his assessments of Plaintiff's impairments in relation to each of these functions on his overall review of the ten years of medical records in this case. (R. 550-58).  However,

Plaintiff notes that ALJ Katz points to no medical evidence to support his ultimate RFC conclusions regarding Plaintiff's ability to perform each of the functions.

"[T]he Second Circuit has never held that an ALJ must conduct 'a function-by-function analysis, and the Third and Sixth Circuits have specifically ruled that such an analysis is not required.'" *Cruz v. Astrue*, 941 F. Supp. 2d 483, 498 (S.D.N.Y. 2013) (citations omitted). Instead, the ALJ "must explain how the evidence supports his or her conclusions about the claimant's limitations and must discuss the claimant's ability to perform sustained work activities." *Casino-Ortiz v. Astrue*, No. 06 Civ. 0155(DAB)(JCF), 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007) (citations and quotation marks omitted), *report and recommendation adopted*, No. 06 Civ. 155(DAB)(JCF), 2008 WL 461375 (S.D.N.Y. Feb. 20, 2008). Substantial evidence must support the ALJ's RFC determination, and the failure to point to medical evidence supporting the RFC determination is a ground for remand. *Valerio v. Comm'r of Soc. Sec.*, No. 08-CV-4253 (CPS), 2009 WL 2424211, at *16 (E.D.N.Y. Aug. 6, 2009) ("Neither the ALJ nor the Appeals Council referred to medical evidence supporting its RFC determination that plaintiff could sit, stand, and walk for up to six hours per eight-hour day and occasionally lift and carry as much as 50 pounds . . . The ALJ seems to have arrived at this determination simply by rejecting [the treating physician's] medical opinion."); *see also Sobolewski v. Apfel,* 985 F. Supp. 300, 314 (E.D.N.Y. 1997) ("[t]he record's virtual absence of medical evidence pertinent to the issue of plaintiff's RFC reflects the ALJ's failure to develop the record, despite his obligation to develop a complete medical history.")

Here, ALJ Katz went through Plaintiff's entire medical history prior to making his determination of the limitations on each of Plaintiff's functions. (R. 550-558). However, with the exception of Dr. Andries' evaluation, which ALJ Katz discounted, there is no medical

evidence in the record pointing to Plaintiff's ability to sit for up to eight hours, stand/walk for up

to six hours, and lift/carry objects weighing up to twenty pounds, as ALJ Katz concluded in his

RFC determination.  "Even if the Appeals Council could properly discount the opinions of

plaintiff's treating physicians, it still had an affirmative obligation to develop the record in order

to produce a RFC determination grounded in substantial evidence."  *Valerio*, 2009 WL 2424211,

at *16 (citing *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir. 1999)).  Instead of pointing to medical

evidence, ALJ Katz noted that a state agency analyst determined on February 20, 2001 that

Plaintiff could perform light work, (R. 553), and the two prior determinations from ALJ Ross

were that Plaintiff could perform light work, (R. 553, 555).  Such opinions do not amount to

medical evidence. *See Legall v. Colvin*, No. 13 CV 1426(VB), 2014 WL 4494753, at *4

(S.D.N.Y. Sept. 10, 2014) ("a disability analyst's (or disability examiner's) opinions are not

entitled to any medical weight"); *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 348 n.10

(E.D.N.Y. 2010) (opinion of disability analyst, who is not a doctor, is not entitled to any medical

weight).  On remand, the ALJ must establish Plaintiff's RFC based on substantial evidence.

## F.  The ALJ's Assessment of Plaintiff's Credibility

Finally, Plaintiff alleges that the ALJ erred in his assessment of Plaintiff's credibility by

failing to explicitly and with sufficient specificity set forth his reasoning for his disbelief of

Plaintiff's statements regarding pain.  This argument is unpersuasive.  It is within the ALJ's

discretion to make a credibility determination with the information before him. *Genier v. Astrue*,

606 F.3d 46, 49 (2d Cir. 2010) (the ALJ "may exercise discretion in weighing the credibility of

the claimant's testimony in light of the other evidence in the record.") (citing *Marcus v.

Califano,* 615 F.2d 23, 27 (2d Cir.1979)).  Plaintiff points to the instances in the record when

Plaintiff complained of pain.  However, ALJ Katz did a detailed analysis of Plaintiff's medical

history and noted the instances in which Plaintiff denied symptoms of fatigue or body aches, had normal thyroid functioning on her replacement therapy, reported being able to do activities of daily living, and had normal physical examination results. Following this review, ALJ Katz concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause some of her reported symptoms, however her statements concerning their intensity, persistence and limiting effects were not entirely credible. This determination was within the ALJ's discretion, was not a legal error, and is supported by substantial evidence.

**G. Remand**

Finally, Plaintiff asserts that the case should be remanded to the Commissioner solely for the calculation of benefits. (Docket Nos. 11, 25, 26). The Commissioner responds that the case should be remanded for further administrative proceedings because the record does not compel a conclusion that Plaintiff is disabled. (Docket No. 19). Courts "have opted simply to remand for a calculation of benefits" where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision[.]" *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999); *see also Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980) (reversing and ordering that benefits be paid where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose."). On the other hand, "remand for further development of the evidence" may be appropriate "where there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa*, 168 F.3d at 82-83 (citations omitted).

Here, ALJ Katz erred in relying on the vocational expert from Hearing II and reached an RFC determination unsupported by substantial evidence. Although I note that more than fifteen years have passed since Plaintiff originally filed for social security benefits, "absent a finding

that the claimant was actually disabled, delay alone is an insufficient basis on which to remand for benefits." *Bush v. Shalala,* 94 F.3d 40, 46 (2d Cir. 1996). Plaintiff contends that Dr. Ediale's assessments of Plaintiff's limitations are "persuasive proof of disability" and therefore, that the case should be remanded solely for the calculation of benefits. (Docket No. 26). However, as I have found that ALJ Katz did not violate the treating physician rule by limiting the evidentiary weight of Dr. Ediale's assessments, based on the record before me, I am unable to conclude that Plaintiff is disabled. Where "further findings will plainly help to assure the proper disposition of the claim" and "it is entirely possible that a complete record would justify the SSA's current conclusion that plaintiff was not disabled at the relevant time, remand for calculation of benefits is not appropriate[.]" *Lugo v. Barnhart*, No. 04 Civ. 1064(JSR)(MHD), 2008 WL 515927, at *25 (S.D.N.Y. Feb. 8, 2008), *report and recommendation adopted*, No. 04 Civ. 1064 (JSR), 2008 WL 516796 (S.D.N.Y. Feb. 27, 2008). Consequently, I recommend that the case be remanded for further administrative proceedings.

## III. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that Plaintiff's motion for judgment on the pleadings should be denied in part and granted in part, the Commissioner's cross-motion should be granted, and the case be remanded for further administrative proceedings.

## IV. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time). A party may respond to another party's objections within fourteen (14) days

after being served with a copy.  Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Kenneth M. Karas at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Kenneth M. Karas and not to the undersigned.  Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:    July 8, 2016
        White Plains, New York

                                        **RESPECTFULLY SUBMITTED,**

                                        JUDITH C. McCARTHY
                                        United States Magistrate Judge